Filed 6/7/24  P. v. Richards CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B324291 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA154855-01) |
| v. | |
| TRAVEON DESHAWN RICHARDS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed in part, reversed in part and remanded with directions.

Randy S. Kravis, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

Armed with a semi-automatic weapon, appellant Traveon Deshawn Richards (defendant) followed Jairo Sanchez and his girlfriend, Teresa Marin, into a liquor store located in territory claimed by defendant's gang. Outside the store, an exchange took place in which Sanchez may have told Richards he belonged to a rival gang. Richards followed Sanchez and Marin on foot as they walked away. Marin noticed Richards following them and urged Sanchez to hurry to which he responded, "stop telling me what to do nigga." After Richards questioned what was said, Marin told him Sanchez had not been talking to him. At that point Richards fired 13 rounds, killing Sanchez.

A jury convicted defendant of one count of first-degree murder and one count of assault with a semiautomatic firearm; it found true two firearm enhancements. The trial court found true allegations that appellant had a prior conviction for robbery that qualified as both a serious felony and a serious and/or violent felony "strike."

On appeal, appellant argues that the trial court erred in: (1) denying his request to instruct the jury on voluntary manslaughter as a lesser included offense of murder based on sudden quarrel or heat of passion; (2) imposing an upper term sentence as to the firearm enhancement for the murder count, without complying with the amended statutory mandates of Penal Code[1] sections 1170 and 1170.1; and (3) doubling his sentence as to the two firearm enhancements.

---

[1] Undesignated statutory references are to the Penal Code.

We reject appellant's first contention, finding there was no reasonable basis for a voluntary manslaughter instruction. We find the trial court failed to comply with the mandates of section 1170.1 in imposing the upper term sentence as to the firearm enhancement for the murder count and we cannot conclude the trial court would have imposed the same sentence had it properly exercised its discretion. As for appellant's third contention, the Attorney General concedes, and we agree, that the court erred by doubling appellant's sentence on the firearm enhancements. We remand the matter for resentencing and to correct the abstract of judgment as to the two firearm enhancements. In all other respects, we affirm the judgment of conviction.

## PROCEDURAL BACKGROUND

On December 8, 2021, appellant was charged by information with murder (count 1; § 187, subd. (a)) and assault with a semiautomatic firearm (count 2; § 245, subd. (b)). As to both counts, the information alleged that appellant personally used a firearm (§ 12022.5, subd. (a)), had suffered a prior serious felony conviction for robbery (§ 667, subd. (a)(1)) and had a prior serious and/or violent felony (strike) conviction (§§ 667, subds. (b)–(j), 1170.12). Appellant pleaded not guilty to both counts and denied the special allegations.

A jury convicted appellant of first degree murder and assault with a semiautomatic firearm and found true the firearm allegations. Appellant waived his right to jury trial on the prior conviction allegations. The trial court found appellant had suffered a prior serious felony conviction.

Appellant was sentenced to a prison term of 70 years to life, as follows: on the murder, 25 years to life, doubled to 50 years to life due to the prior strike, plus a consecutive high term of

3

10 years for the firearm enhancement, doubled to 20 years. On the count of assault with a semiautomatic firearm, the sentence was three years, doubled to six years, plus three years, doubled to six years, for the firearm enhancement, to run concurrently to the sentence for murder. This appeal followed.

## FACTUAL BACKGROUND

### 1. *The Prosecution's Case*

#### a. *Events Leading to the Shooting*

On the evening of June 27, 2021, Marin and Sanchez, whom Marin had been dating a few months, walked to the N'Joy Liquor Store, near the intersection of Wilmington and 109th Streets in Los Angeles, to buy snacks and a drink. Neither person carried a weapon.

Marin grew up nearby, was a frequent customer of the store, and knew the area, claimed by the Ten Line gang, was unsafe. Marin and Sanchez were members of the Watts Varrio Grape gang, a rival of the Ten Line gang to which defendant belonged.

Santiago Ramirez worked as a security guard at the liquor store. He recognized Marin and Sanchez but did not know their names. Ramirez also recognized an African American man he knew as "Cyco," a frequent customer at the store. The man wore a white T-shirt and had a gun in his front right pocket when he entered the store. Ramirez, who was "scared" to testify at trial, said defendant was not the person he knew as Cyco. Shown a photograph of several individuals (Peo. Exh. No. 7), Ramirez testified he was familiar with Cyco's friends, cousins, and a wheelchair-using uncle, many of whom frequented the liquor store.

4

Marin did not notice anything unusual while she and Sanchez were inside the liquor store.  Sanchez bought a beer and left while Marin waited to pay for her items.  When she left the store Marin saw Sanchez standing within "arm distance" of another man.  Marin heard the man whisper "something" to Sanchez and say "stuff."  As she approached, Marin heard Sanchez respond to the man saying, "Watts Varrio Grape Street." Sanchez said nothing else to the man and did not look at him. The man warned Sanchez not to "come around here no more." Marin told Sanchez to ignore the man, and the couple began to slowly walk away.  The man followed them.

As they walked away, Marin looked back, saw the man following them and noticed a gun in the pocket of his shorts.  She told Sanchez to "hurry up" because the man "ha[d] a gun." Sanchez replied, "stop telling me what to do, nigga."[2]  At that point, the man said, "what'd you say," and Marin responded that Sanchez "wasn't talking to him."  Sanchez said nothing.  After she and Sanchez had taken a few steps Marin heard the man "rack" the gun.  She looked back, saw the man holding out the gun with both hands and told Sanchez to run.  He did not. Marin moved to the side.

The man ignored Marin and began shooting at Sanchez who fell to the ground.  After the shooting stopped, Marin yelled at the man who was running back toward the store holding his waistband.  She then went to help Sanchez, as did a bystander who began performing CPR.  Ramirez had also heard gunshots,

---

[2]     Marin testified that the "N-word" was a "term of endearment" between herself and Sanchez.

followed by the sight of the man in the white T-shirt running away.

Marin repeatedly answered "no" when asked whether the man who shot Sanchez was in the courtroom. She still lived in the area and admitted she was "scared to testify in court" for fear of something happening to others. Marin identified Sanchez in a photo.

Marin was shown photographs from inside the store of a man wearing a white T-shirt and shorts, but said she did not remember seeing him in the store. She also testified that the man who had spoken to Sanchez outside the store was not depicted in the photographs. From still shots taken from video footage, Marin identified the body on the ground as Sanchez. She also identified herself, Sanchez and the shooter wearing a white T-shirt from video footage taken inside the store.

b. *Crime Scene Evidence and Video Footage*

At the time of the shooting, Los Angeles Police Department (LAPD) Officers Issac Guevara and Brenda Cortez heard gunshots as they patrolled nearby. When they arrived at the intersection of 109th and Wilmington at about 7:17 p.m., they saw spent casings and a shooting victim lying on the ground. A citizen was performing chest compressions on Sanchez who had blood all over his shirt, and whose eye was dislodged. The officers took over and performed chest compressions on Sanchez. No weapons from Sanchez or Marin were recovered from the crime scene.

LAPD Detective John Jamison arrived at the crime scene by 11:00 p.m. the day of the shooting. He recovered 13 spent cartridge casings from the sidewalk area on Wilmington near

6

109th Place.  A spent casing is typically expended from a semiautomatic firearm.

The jury was shown surveillance video from inside the liquor store, and exterior footage from nearby residences which captured the shooting itself.  The investigating officer, LAPD Detective Irma Castillo, reviewed the video surveillance and camera footage of the incident for the jury.  Based on his tattoos, facial hair, clothing, hat and shoes, Detective Castillo believed appellant was both the man who had been inside the store wearing a white T-shirt and who confronted Sanchez and Marin outside.  Detective Castillo searched social media accounts associated with the Ten Line Crips to try to link the person in the surveillance video to defendant.  On Instagram Detective Castillo found an account with the user name "headnigga_rgcyco3."  Another Instagram account with the vanity name "Mr. 10Line," contained a photo of a person identified as "Deshawn Da Fliikiid Richards," whom Detective Castillo believed to be defendant, as well as videos taken in the area surrounding the N'Joy liquor store.  A photograph of defendant taken in a holding cell depicts a tattoo reading, "Cyco."

From video footage taken inside the store, Detective Castillo described for the jury individuals in the liquor store, including Ramirez, Marin (who was in line for the cash register), Sanchez (who was smiling and "minding his own business"), and defendant (who had tattoos, was wearing a white T-shirt and had a hand leaning against his right pocket).  The footage showed defendant (with the butt of a handgun visibly protruding from his right pocket) looking toward Sanchez, and later exiting the store with his hand on his right pocket.

7

From portions of video and still photos taken from the camera of a residence facing the liquor store, Detective Castillo described Sanchez and Marin walking together on the sidewalk, followed by defendant. Marin kept turning around, then she and Sanchez sped up. The video showed defendant pull a handgun from the pocket of his shorts, extend his arm and fire at the couple. Marin ducked and Sanchez fell to the ground. Defendant continued to advance and fire at Sanchez as he lay on the ground.

An autopsy performed on Sanchez revealed he suffered 11 gunshot wounds. Four shots–one each to his head, neck, chest and left thigh–were independently fatal. The cause of death was deemed a homicide.

c. *Gang Evidence*

LAPD Officer Carlos Gonzalez, an expert on criminal street gangs, testified about several gangs including the Watts Varrio Grape, Grape Street Crips and Ten Line Crips. The Watts Varrio Grape gang (which is affiliated with the Mexican Mafia) is predominantly Hispanic, and the Grape Street Crips gang is predominantly African American. The N'Joy liquor store is located in territory claimed by the Ten Line Crips gang. Two primary rivals of the Ten Line Crips gang are the Grape Street Crips and Watts Varrio Grapes.

Officer Gonzalez testified about violence among and between street gangs. If a gang member challenges a member of a rival gang to a fight, the person challenged is expected to engage and identify his gang. If he fails to do so, he may be disciplined by his own gang. It is viewed as disrespectful for a gang member to enter a rival gang's territory, and the intruder may be attacked, beaten, shot or killed. Typically, a gang member who enters rival gang territory is armed. If not, he

probably does not plan to threaten a rival gang member. When someone within his own gang territory "calls out another," it usually results in violence. Witnesses to gang violence who live or work in the area generally refuse to cooperate with police, fearing retaliation.

2. ***Defense Evidence***

Appellant did not testify.

Detective Castillo testified about her interview of Marin on the day of the shooting. Marin told Detective Castillo she had been a member of the Watts Varrio Grape gang for several years.

Detective Castillo reviewed the contents of Marin's cell phone, including text messages. A text sent by Marin at 7:42 p.m. the night of the shooting read: "Hey 911," "They shot Klepto," (Sanchez's moniker), and "110" (referring to the Ten Line Crips). The recipient responded: "What u mean He got shot," to which Marin had texted in response: "110 did it blk fool and I think he's dead the ambulance took him." Marin sent additional texts that read: "Tell [M]anos I don't know what to do," "Im not going [to] remember what he look like cuz I got scared," and "the blk fools were mad digging [*sic*] [looking angrily at] me." Marin received a text telling her, "don't say nothing," "Be careful wen they let u go," and "come to my trailer."

Detective Castillo arrested defendant and searched his residence. She did not find a gun on defendant's person or in his residence. Defendant was not wearing a T-shirt or sneakers like those worn by the individual depicted in surveillance footage from the liquor Store. Detective Castillo identified defendant as the man wearing the white T-shirt on the surveillance video.

9

## DISCUSSION

1. ***The Evidence Did Not Warrant an Instruction on Voluntary Manslaughter Based on Heat of Passion.***

Defendant maintains that his murder conviction must be reversed because the record comprises substantial evidence from which a reasonable juror could conclude he shot Sanchez out of heat of passion. He insists the trial court erred in refusing his request to have the jury instructed on the lesser included offense of voluntary manslaughter based on sudden quarrel or heat of passion. He is mistaken.

### a. *Procedural Background*

During a conference on instructions, defense counsel asked the court to instruct the jury on voluntary manslaughter "under the heat of passion lesser included" (CALCRIM No. 570). Counsel argued that Sanchez's use of the "N-word," coupled with his possible affiliation with a rival gang, was sufficient to justify a juror's conclusion that appellant reasonably shot Sanchez out of heat of passion.[3]

---

[3] CALCRIM No. 570 states: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or

The People argued it would be more appropriate for the court to give CALCRIM No. 522, regarding provocation to reduce murder from first to second degree. Notwithstanding the "racial epithet that may have been uttered," the People argued the evidence indicated premeditation and deliberation by appellant who entered the store with a gun in his pocket, then followed the victims after they left before firing at them multiple times. The People argued it would be "misplaced to try to suggest uttering the N-word would suggest a response of emptying a magazine of ten rounds at people on the street, if we're going to suggest that

---

intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] [If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

11

this isn't a gang-related heat of passion but rather a racial epithet, neither apply."

The trial court acknowledged that, based on the order in which the victims' statements were made, the shooter could have believed the racial slur was directed at him. Nevertheless, the court declined to instruct the jury on manslaughter based on heat of passion, explaining:

> "[I]n order to give instructions on it, the court has to find substantial evidence. And in this case with regards to heat of passion, we look at . . . three things, the testimony . . . , and then I look at the description of what heat of passion is. [¶] And if you see the video, I recall the video being that the two individuals, victim 1 and victim 2 go right along the sidewalk, the so-called encounter is finished with. They pass in the direction that they go to, and only after that is when the shooter follows. The shooter follows, and then suddenly, just opens fire at them. There's no heat of passion. [¶] Now the prov[o]cative conduct by the victim may be . . . verbal. But the conduct must be sufficiently prov[o]cative that it would cause an—and this the key word—ordinary person of average disposition to act rashly or without due deliberation or reflection. And that's under *People* [*v.*] *Lee* [(1999)] 20 Cal.4th 47. [¶] And this is far from it. This is not an ordinary person of average disposition that's acted rashly. So the court is not going to instruct on the heat of passion. [¶] However, the court agrees that the provocation, as [defense counsel] put it, and as I think the People concede . . . the provocation effect on the degree of murder is something that [the jury] should consider. So the court will give [CALCRIM No.] 522. It says, provocation may reduce murder from first degree to second degree . . . ."

The court's instructions to the jury included CALCRIM No. 522.[4]

b.    *Controlling Law and the Standard of Review*

A trial court must instruct the jury on general principles of law relevant to issues raised by the evidence.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 586.)  This duty includes the duty to instruct on " 'lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present.' "  (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*), disapproved on another ground by *People v. Schuller* (2023) 15 Cal.5th 237, 260 (*Schuller*).)  If substantial evidence exists that would support a conclusion that the lesser and not the charged offense was committed, the court has a duty to instruct even if the instruction was not requested.  (*People v. Kruse* (2020) 56 Cal.App.5th 1034, 1045–1046.)  If a reasonable juror could find that the lesser included offense, but not the greater, was committed, the court must instruct on the lesser offense.  (*People v. Cruz* (2008) 44 Cal.4th 636, 664.)

We review the issue de novo and independently determine whether a lesser included offense instruction should have been given.  (*People v. Avila* (2009) 46 Cal.4th 680, 705.)  We resolve all doubts as to the sufficiency of evidence to warrant such an instruction in favor of the defendant, and do not weigh witness

_____

[4]    CALCRIM No. 522 states: "Provocation may reduce a murder from first degree to second degree.  The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

13

credibility.  (See also *id.* at p. 712.; *People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*) [appellate court determines independently whether an instruction on lesser included offense of voluntary manslaughter should have been given].)

"California law separates criminal homicide into two classes: the greater offense of murder and the lesser offense of manslaughter.  [Citation.]  Murder is defined as 'the unlawful killing of a human being . . . with malice aforethought' (§ 187, subd. (a)), while manslaughter is defined as 'the unlawful killing of a human being without malice' (§192).  Thus the 'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.' [Citation.]  Malice exists when 'an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow creature" (§188), or with awareness of the danger and a conscious disregard for life.' " (*Schuller, supra,* 15 Cal.5th at p. 252.)

" 'Generally, the intent to unlawfully kill constitutes malice.' " (*Schuller, supra*, 15 Cal.5th at p. 252.)  As relevant here, "California law recognizes [a] circumstance[] where 'a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill,' " specifically "when a person kills ' " 'in a "sudden quarrel or heat of passion." ' " ' " (*Ibid*.)  Such " 'mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter "by *negating* the element of malice that otherwise inheres in such a homicide." ' " (*Ibid*.)

"A killing committed in a heat of passion on sufficient provocation is voluntary manslaughter." (*People v. Rountree* (2013) 56 Cal.4th 823, 855.) " 'Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.' " (*People v. Vargas* (2020) 9 Cal.5th 793, 827 (*Vargas*).) "Heat of passion killing is distinct from malice murder because thought in some form is necessary 'to form either an intent to kill or a conscious disregard for human life.' " (*Id.* at pp. 827–828.) "A heat of passion killing . . . is one caused by an unconsidered reaction to provocation rather than the result of rational thought," and "[i]f reason ' " 'was obscured or disturbed by passion' " ' to so great a degree that an ordinary person ' " 'would act rashly and without deliberation and reflection," it has been concluded that such a "killing arose from passion rather than from judgment.' " ' " (*Id.* at p. 828; see *People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549.) The subjective component looks to the defendant's state of mind to see whether, in fact, he acted in the heat of passion. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 (*Steele*).) The provocation must be initiated by the victim. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) No specific type of provocation is required, and "the passion aroused need not be anger or rage but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion.' " ' " (*Breverman, supra,* 19 Cal.4th at p. 163.) The objective component requires the victim's behavior to have been provocative enough to cause an ordinary person of average disposition to act rashly or without deliberating or reflecting. (*People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*);

15

see *Beltran, supra,* 56 Cal.4th at p. 949 [The question is not whether a reasonable ordinary person of average disposition would be moved to kill, but whether a reasonable ordinary person of average disposition would react].)

" 'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react without reflection,' " and the " 'anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 650, italics omitted (*Beck and Cruz*; *Beltan, supra*, 56 Cal.4th at p. 949.) A defendant may not "set up his own standard of conduct." (*People v. Cole* (2004) 33 Cal.4th 1158, 1215–1216.) "No instruction on lesser included offenses is required if there is no evidence that there was any offense less than that charged." (*Vargas, supra*, 9 Cal.5th at p. 827.)

"Instructing the jury on a lesser included offense is not required when the evidence supporting such an instruction is weak, but ' " 'whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury,' " ' such an instruction is required." (*Vargas, supra*, 9 Cal.5th at p. 827.) "Whether the evidence is substantial is tested by considering whether a jury would conclude the lesser but not the greater offense was committed." (*Ibid.*) "Manslaughter instructions are warranted when substantial evidence exists to support a jury's determination that the killing was committed in the heat of passion and thus does not constitute a first-degree murder." (*Ibid.*)

16

"[W]hen provocation [is] at issue, the prosecution is compelled to disprove those circumstances beyond a reasonable doubt." (*Schuller, supra*, 15 Cal.5th at p. 254.) "California's standard jury instructions on voluntary manslaughter include this requirement." (*Ibid.*) An erroneous failure to instruct on this theory when supported by substantial evidence is subject to review under *Chapman v. California* (1967) 386 U.S. 18. (See *Schuller,* at pp. 260–261.)

      c.     *No Instructional Error Occurred Because the Record Lacks Substantial Evidence of Sudden Quarrel/Heat of Passion.*

Considering the evidence here, as we must, in the light most favorable to defendant, we conclude the record lacks sufficient evidence that he was subjectively and objectively provoked to kill Sanchez.

First, the trial court was required to instruct on voluntary manslaughter (based on sudden quarrel/heat of passion) only if a reasonable jury could have found that appellant was *subjectively* provoked by Sanchez's use of the word "nigga" to act rashly and without due deliberation and reflection. (See *Beck and Cruz, supra,* 8 Cal.5th at p. 650.)

Defendant contends the record includes substantial evidence to support a juror's conclusion that he was subjectively provoked into a state in which he experienced a violent, intense, highly-wrought or enthusiastic emotion to Sanchez's use of a highly charged racial slur. Defendant concedes that he followed Sanchez and Marin as they walked away from the liquor store. But he maintains that the fact that the gun remained in his pocket as he followed the couple, demonstrates he did not intend to shoot Sanchez, but wanted only for him to leave Ten Crips

17

territory. Defendant's state of mind changed markedly only after he heard Sanchez utter the word "nigga." Only at this point did defendant pull the gun from his pocket and shoot Sanchez. Defendant insists the fact that he shot Sanchez so many times, even after the man fell to the ground is indicative of and "consistent with the intensely emotional state of mind that he was in." In short, the fact that he fired many more shots than would have been necessary to kill Sanchez demonstrates that he was in a state of heat of passion that negated malice.

Even if we assume defendant satisfied the subjective component of this test, he failed to satisfy the objective component. Appellant acknowledges that numerous courts have found that a victim's verbal taunts, or offensive and insulting words are insufficient to satisfy the "objectively reasonable" component of provocation. For example, in *People v. Najera* (2006) 138 Cal.App.4th 212, 226, the victim taunted defendant by calling him a "faggot." The court found this was "insufficient to cause an ordinary person to lose reason and judgment under an objective standard." (*Ibid*.) Similarly, in *Manriquez*, the victim "called defendant a 'mother fucker' and . . . taunted defendant, repeatedly asserting that if defendant had a weapon, he should take it out and use it." (*Manriquez, supra*, 37 Cal.4th at p. 586.) The Supreme Court found such taunts "insufficient to cause an average person to become so inflamed as to lose reason and judgment." (*Ibid*.; see also *Enraca, supra,* 53 Cal.4th at p. 759 [rejecting argument "that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter"].)

So, too, here. To warrant an instruction on heat of passion, the defendant must actually have killed in the heat of passion,

and the circumstances that gave rise to the passion must be such that they would arouse such passion in the mind of a reasonable person. (*Steele, supra,* 27 Cal.4th at pp. 1252–1253.) Ample case law and our independent review of the record supports the trial court's conclusion that Sanchez's single use of a racial slur was insufficiently objectively provocative to warrant a voluntary manslaughter instruction. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826–827 [insufficient provocation for voluntary manslaughter existed when the defendant and the victim engaged in a verbal argument shortly before the killing, during which the defendant testified that he told the victim " '[g]et off me, you f . . . ing bitch' " and the victim " 'cuss[ed] back at' " him].) The record lacks sufficient evidence that defendant acted under an objectively reasonable and intense surge of passion when he fired 13 shots at Sanchez who was both unarmed and walking away. The trial court did not err in refusing to instruct the jury on voluntary manslaughter with CALCRIM No. 570.

2. ***The Trial Court's Error in Imposing the Upper Term Sentence on the Firearm Enhancement as to Count 1 Based on Aggravating Factors Not Found True Beyond a Reasonable Doubt Requires Remand for Resentencing.***

Defendant argues that remand for resentencing is required because the trial court erred in imposing the upper term sentence on the firearm enhancement attached to the murder conviction based on seven aggravating factors to which he did not stipulate, and which a jury or court did not find true beyond a reasonable doubt.

The Attorney General maintains defendant forfeited his claim of sentencing error as to the court's imposition of the upper term for the firearm enhancement for count 1 by failing to raise

19

the issue at the time of sentencing.  Alternatively, the Attorney General argues resentencing as to firearm enhancement is not necessary because at least one of seven aggravating factors on which the trial court relied to impose the upper term was found true beyond a reasonable doubt.  Finally, the Attorney General asserts if there was trial court error, it was harmless.

  a. *Controlling Law*

 As explained in *People v. Falcon* (2023) 92 Cal.App.5th 911, review granted September 13, 2023, S281242 (*Falcon*), Senate Bill No. 567 (2021–2022 Reg. Sess.) (Sen. Bill No. 567), which became effective in January 2022, "materially revised the determinate sentencing scheme under section 1170[, former subdivision] (b)" (*Falcon,* at p. 924) "and the amended law now limits a trial court's discretion to impose an upper term." (*Id.* at p. 918, citing § 1170, subd. (b)(1)).  "Presumptively, the middle term is the maximum term that may be imposed, and it may be exceeded 'only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term . . . .' [Citation.]  In addition, the facts underlying those circumstances must be proven, stipulated to by the defendant or evidenced in a specific manner not required under the former law." (*Id.* at p. 918.)

 "The plain language of this new configuration creates a presumption that the middle term is the default maximum sentence, and this new presumption bears weight on how the trial court may exercise its discretion to depart from the presumptive rule.  [Citation.]  Unlike its predecessor, the statute does not allow a court to select an upper term simply because it appears warranted and supported by aggravating circumstances. Instead, in distinct contrast with the former sentencing scheme,

the court's decision to impose an upper term is now expressly framed around whether properly proven or established aggravating circumstances justify invoking the exception to the rule that the middle term is the default maximum sentence." (*Falcon, supra*, 92 Cal.App.5th at p. 925, review granted.)

Under section 1170 as amended, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).) Otherwise, " '[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. . . .' " (*Falcon, supra*, 92 Cal.App.5th at p. 925, review granted; § 1170, subd. (b)(2).)

Similar principles apply to section 1170.1 which governs sentencing for enhancements:

"(1) When the court imposes a sentence for a felony pursuant to Section 1170 or subdivision (b) of Section 1168, the court shall also impose, in addition and consecutive to the offense of which the person has been convicted, the additional terms provided for any applicable enhancements. If an enhancement is punishable by one of three terms, the court *shall*, in its sound discretion, order imposition of a sentence *not to exceed the middle term*, except as otherwise provided in paragraph (2).

"(2) The court may impose a sentence exceeding the middle term *only* when there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the

21

middle term, *and* the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170.1, subd. (d), italics added.)

        b.     *No Forfeiture*

As a threshold matter, relying on *People v. Flowers* (2022) 81 Cal.App.5th 680, review granted October 12, 2022, S276237 (*Flowers*), the Attorney General argues appellant forfeited his claim of error by failing to raise any Senate Bill No. 567 issues at the time of his sentencing hearing. (See *Flowers,* at pp. 683–684 [defendant forfeited his claim that trial court erred in imposing upper term punishment pursuant to former section 1170].) As noted above, the applicable versions of sections 1170 and 1170.1 became effective in January 2022. Defendant was sentenced on October 24, 2022.

Defendant insists his claim remains cognizable on appeal notwithstanding his counsel's failure to object because, in imposing the upper term sentence as to the enhancement, the trial court failed to comply with explicit sentencing mandates of the current version of section 1170.1, subdivision (b)(2), and thus, the sentence is unauthorized. (See *People v. Panozo* (2021) 59 Cal.App.5th 825, 839 [rejecting forfeiture argument despite absence of objection because the claim related to trial court's misapprehension of statutory sentencing obligations]; *People v. Scott* (1994) 9 Cal.4th 331, 354 (*Scott*).)

The Attorney General's reliance on *Flowers* is misplaced. *Flowers* involved a challenge to an upper term sentence under the former version of section 1170, which gave the trial court discretion to impose any of three prescribed terms. Since the court's decision to impose an upper term sentence was purely

22

within its discretion, the defendant's failure to object at the time of sentencing forfeited the issue on appeal. (*Flowers, supra,* 81 Cal.App.5th at pp. 683–684, review granted.)

This matter involves application of amended section 1170.1, which expressly limits the trial court's discretion to impose an upper term sentence as to enhancements. The question is close. We acknowledge defendant was sentenced several months after the new rule became effective. It is also true that the trial court may lawfully have imposed the upper term had it complied with the statutory requirements in effect at the time of sentencing. Neither party addressed the new requirements in their sentencing memoranda, nor were the requirements discussed in the probation report the court reviewed. The court did not discuss any facts underlying the aggravating factors on which it relied for sentencing as to the enhancement on count 1.

We are mindful of the Supreme Court's admonition that ameliorative changes to criminal sentencing law are applied broadly. (Cf., *People v. Superiour Court* (*Lara*), (2018) 4 Cal.5th 299, 308 [absent indications to the contrary, the Legislature ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not].) For reasons explained below, we cannot conclusively determine there is no reasonable probability the trial court would have adopted amended section 1170.1's presumption in favor of using the middle term, and that its failure to adhere to statutory mandates may have resulted in an unauthorized sentence. Accordingly, we find no forfeiture.

c.      *Relevant Factual Background*

The trial court cited seven aggravating factors in choosing to impose the high term sentence for the firearm enhancement attached to the murder conviction: (1) Appellant's crimes involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness within the meaning of California Rules of Court, rule 4.421(a)(1);[5] (2) Appellant was armed with or used a weapon at the time of the commission of the crime within the meaning of rule 4.421(a)(2); (3) The victim was particularly vulnerable within the meaning of rule 4.421(a)(3); (4) The manner in which the crime was carried out indicated planning, sophistication, or professionalism within the meaning of rule 4.421(a)(8); (5) Appellant was engaged in violent conduct that indicated a serious danger to society within the meaning of rule 4.421(b)(1); (6) Appellant's prior convictions were numerous and increasing in seriousness within the meaning of rule 4.421(b)(2); and (7) Appellant served a prior prison term under rule 4.421(b)(3). The court found no mitigating circumstances.

The trial court did not discuss the facts underlying its findings as to any aggravating circumstance.  Nor, as in *People v. Zabelle* (2022) 80 Cal.App.5th 1098 (*Zabelle*), did the court indicate that it afforded any "particular weight to any of its listed aggravating circumstances[, or] whether its decision to impose the upper term was (or was not) a close call." (*Id*. at p. 1115; see *People v. Lopez* (2022) 78 Cal.App.5th 459, 468 (*Lopez*) ["trial court offered no indication that it would have selected an upper

---

[5]      Undesignated rule references are to the California Rules of Court.

24

term sentence even if only a single aggravating factor or some subset of permissible factors were present"]; cf. *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*) [remand for resentencing proper if record does not clearly indicate the court would have imposed the same sentence under different sentencing presumption].)

Defendant argues his upper term sentence as to the enhancement is unauthorized because he never stipulated to the underlying circumstances, nor did the jury or trial court find any aggravating factor true "beyond a reasonable doubt."

The Attorney General maintains that resentencing is not required because one aggravating factor–that appellant served a prior prison term–may be deemed to have been found true beyond a reasonable doubt by virtue of the court's reliance on a certified record of that factor. Accordingly, because this aggravating circumstance upon which the court relied in sentencing appellant presumably was found true beyond a reasonable doubt, there was no violation of appellant's Sixth Amendment right to a jury, nor any violation of section 1170.1, subdivision (d).

The Attorney General is mistaken. Section 1170, subdivision (b)(3) provides for an exception to the proof requirements for aggravating factors based on a prior conviction: "Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." However, this paragraph *"does not apply to enhancements imposed on prior convictions."* (§ 1170, subd. (b)(3), italics added.) Section 1170.1, subdivision (d)(1), (2) contain no "prior conviction exception" to the imposition of the upper term for enhancements with triads. Rule 4.420(c) also

25

expressly provides that, "the court may consider the fact of the defendant's prior convictions based on a certified record of conviction without it having been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial. *This exception does not apply to the use of the record of a prior conviction in selecting the upper term of an enhancement*." The plain language of these provisions requires that either defendant stipulate to the fact or a trier of fact find the fact beyond a reasonable doubt.

### d.     *The Standard of Review*

The parties dispute the standard of review when a sentencing court imposes an upper term sentence in partial reliance on an aggravating circumstance not found true by the jury. (E.g., compare *Lopez, supra,* 78 Cal.App.5th at pp. 465–466, [error is harmless only if appellate court concludes a jury would have found true beyond a reasonable doubt every factor on which the court relied], and *People v. Dunn* (2022) 81 Cal.App.5th 394, review granted Oct. 12, 2022, S275655 (*Dunn*), with *People v. Flores* (2022) 75 Cal.App.5th 495, 500–501 [harmless error so long as appellate court finds the jury would have found at least a single aggravating circumstance true beyond a reasonable doubt].)

More recent authorities have suggested a hybrid standard of review which we find applicable.[6] Under this standard, there are two inquiries. First, to satisfy federal constitutional requirements, we must conclude beyond a reasonable doubt that

---

[6]     The Supreme Court is set to resolve this split. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted August 10, 2022, S274942.)

26

a jury–also applying the beyond a reasonable doubt standard–
would have found true at least a single aggravating
circumstance.  (*Zabelle*, *supra*, 80 Cal.App.5th at p. 1112; see also
*Dunn, supra,* 81 Cal.App.5th at p. 401, review granted; see *People
v. Sandoval* (2007) 41 Cal.4th 825, 839 (*Sandoval*).)  Second, the
appellate court must determine, under the California *Watson*
standard (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)),
whether the trial court would have imposed the upper term
regardless of the error.  This examination involves two steps.  "In
particular, we must consider whether it is reasonably probable
that the trial court would have chosen a lesser sentence in the
absence of the error.  [Citation.]  Resolving this issue entails two
layers of review.  We must first, for each aggravating fact,
consider whether it is reasonably probable that the jury would
have found the fact not true.  We must then, with the
aggravating facts that survive this review, consider whether it is
reasonably probable that the trial court would have chosen a
lesser sentence had it considered only those aggravating facts."
(*Zabelle,* at p. 1112.)

Applying this analytical framework, it may be said that, by
virtue of its verdicts, the jury necessarily and implicitly found the
first two aggravating circumstances cited by the court established
beyond a reasonable doubt.  Clearly, the crime of murder involves
great bodily injury.  (Rule 4.421(a)(1).)  Similarly, the second
factor—that appellant was armed with a weapon—is inherent in
the firearm enhancement itself.  (Rule 4.421(a)(2).)  Reliance on
these factors to impose the upper term as to the firearm
enhancement may constitute an impermissible dual or
overlapping use of facts.  (*People v. Moberly* (2009)
176 Cal.App.4th 1191, 1197; *Scott, supra,* 9 Cal.4th at p. 350

27

[Generally a court "may [not] use a fact constituting an element of the offense either to aggravate or to enhance a sentence."]; *People v. Barker* (1986) 182 Cal.App.3d 921, 941 [Where there is an improper dual or overlapping use of facts, remand is required if it is reasonably probable the defendant would obtain a more favorable result].)

Defendant did not object to the court's use of overlapping aggravating factors at the time of sentencing. Nothing in Senate Bill No. 567 relieved him of the obligation to object to the court's dual use of facts to preserve that claim on appeal. Accordingly, he forfeited any appellate challenge to an improper dual use of facts. (See *People v. de Soto* (1997) 54 Cal.App.4th 1, 9 [failure to specifically object to the court's dual use of facts in sentencing forfeited the issue on appeal]; *People v. Gonzalez* (2003) 31 Cal.4th 745, 755 [same].)

The Attorney General contends that the seventh aggravating factor on which the court relied—appellant served a prior prison term—was properly relied upon as proven beyond a reasonable doubt, because it was established by certified records. Not so. As discussed above, section 1170.1 does not include a "prior conviction exception" to the imposition of the upper term for firearm enhancements with triads. (§ 1170.1, subd. (d)(1), (2); rule 4.420(c).)

Because the jury may have found at least one aggravating circumstance true beyond a reasonable doubt, there is no Sixth Amendment violation. A sentencing court may impose a sentence higher than the statutory maximum based on one aggravating circumstance found true by the jury. (See *Dunn, supra*, 81 Cal.App.5th at p. 409, review granted ["A fact that is *necessary* to impose a sentence above the statutory maximum must be

28

proved to a jury beyond a reasonable doubt. . . . [W]hen multiple aggravating circumstances not proved to the jury are relied upon by a trial court in imposing the upper term, the reviewing court must only conclude beyond a reasonable doubt that *one* of those circumstances would have been found true by the jury beyond a reasonable doubt to avoid offending the Sixth Amendment"].)

Thus, we turn to state law and apply the harmless error standard set forth in *Watson*: "[T]he question posed is whether, in the absence of the improperly considered sentencing factor(s), there is a reasonable probability of a more favorable outcome for the appealing party—i.e., the imposition of a lesser sentence." (*Falcon, supra*, 92 Cal.App.5th at p. 941, review granted; see *People v. Avalos* (1984) 37 Cal.3d 216, 233 (*Avalos*); *People v. Price* (1991) 1 Cal.4th 324, 492 (*Price*).) Although a single aggravating factor might be sufficient to satisfy the Sixth Amendment (*Zabelle, supra*, 80 Cal.App.5th at pp. 1111–1112), the same cannot be said under Senate Bill No. 567. (*Zabelle,* at p. 1115.) In *Zabelle*, as here, the court alluded to multiple aggravating factors but did not state which factor, or combination of factors, compelled it to select the upper term. (*Ibid.*)

Setting aside the dual use of the first two aggravating factors, the trial court improperly cited five remaining aggravating circumstances. The sentencing court did not suggest that it had considered any aggravating circumstance more heavily than any other. However, it appears reasonably likely that the aggravating circumstance that defendant served a prior prison term influenced the court to impose the upper term on the enhancement. If so, such reliance was inappropriate. Section 1170, subdivision (b)(3)'s exception for reliance on a certified record of conviction without submission to a jury does not apply

29

to enhancements imposed on prior convictions. (See §§ 1170, subd, (b)(3), 1170.1, subd. (d)(1), (2); rule 4.420(c).)

Turning to the remaining aggravating factors, the sentencing court found that Sanchez was "particularly vulnerable." That conclusion is debatable. Courts have found that " 'a "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases." ' " (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 558.) " 'Particularly . . . means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act.' " (*People v. Loudermilk* (1987) 195 Cal.App.3d 996, 1007; *People v. DeHoyos* (2013) 57 Cal.4th 79, 154.)

For two reasons, we conclude it is reasonably probable that a jury would not have found this circumstance true beyond a reasonable doubt. First, as explained by the prosecution's gang expert, Sanchez, an adult member of the Watts Varrio Grape gang, voluntarily chose to assume the well-known risk of violence associated with entry into rival gang territory. Second, whether Sanchez may be said to have been particularly vulnerable is a comparative standard; it requires speculation as to whether a jury would have concluded the circumstances surrounding these crimes rendered him more vulnerable than other victims. (See *People v. Wandrey* (2022) 80 Cal.App.5th 962, 983, review granted Sept. 28. 2022, S275942, review dism. Aug. 30, 2023 [finding harmless error in the court's reliance on particular vulnerability would require some degree of speculation, given the quantitative standard].)

Although Sanchez was vulnerable in the sense that he was unarmed and walking away from the store, the evidence suggests he was not "particularly vulnerable." Sanchez was outside, in an open public space, not cornered or in a confined space. He was in territory claimed by a rival gang. Sanchez was vulnerable to the extent anyone being followed by an armed man is vulnerable, but that alone did not render him "particularly" vulnerable. From this evidence, a reasonable jury could conceivably conclude that Sanchez was not unusually defenseless. Thus, it is reasonably probable that a jury might not have found beyond a reasonable doubt that Sanchez was a particularly vulnerable victim. (See *Sandoval, supra,* 41 Cal.4th at p. 841 [remanding in part because the record did not "reflect such a clear-cut instance of victim vulnerability that we confidently can conclude the jury would have made the same findings"].)

Similarly questionable is the court's finding that the shooting was carried out in a manner indicating planning, sophistication, or professionalism. Defendant was armed when he entered the liquor store after Sanchez and Marin but did not shoot until after the couple left the store, after Sanchez identified his gang membership and after defendant heard Sanchez utter the word "nigga." The fact that defendant was armed from the outset and followed the couple as they walked away lends itself to a conclusion that the shooting was planned. However, a reasonable jury could conceivably conclude that firing 13 shots (four of which were fatal) in a surveilled public area and even after Sanchez fell to the ground, was neither sophisticated nor professional. The murder was committed by brute force and violence, not by a particularly sophisticated method. Sadly, this case involves the relatively routine act of severe violence by a

31

gang member against a suspected rival.  A jury could rationally find that defendant's conduct did not exhibit criminal sophistication or professionalism.

Although less ambiguous, it is nevertheless questionable whether the jury would have concluded beyond a reasonable doubt that defendant's prior convictions were "numerous and increasing in seriousness' " as the trial court found.  According to te probation report, defendant had four juvenile adjudications between 2005 and 2007,[7] and a single prior conviction for armed robbery (when he was age 16 but treated as an adult) in 2009.  That conviction occurred 12 years before the crimes at issue, and appellant remained in prison until 14 months before Sanchez was murdered.  There is no question defendant has a criminal record, which has (mostly) increased in severity.  It is less clear, however, that a jury would have found beyond a reasonable doubt that his aged convictions were "numerous."  Determining numerosity or the increasing seriousness of prior crimes involves subjective factfinding and may be subject to reasonable dispute in a given case.

The final aggravating factor cited by the court was that defendant was engaged in violent conduct that indicated a serious danger to society.  A reasonable jury likely would find that factor proven beyond a reasonable doubt.  However, no such finding was made here by the jury or by the trial court, and we cannot make that finding definitively on this record.

---

[7]     According to his probation report, defendant's first juvenile adjudication in 2005 (at age 12) was for robbery.  He had two adjudications 2006 for burglary and grand theft, and one in 2007 for possession of marijuana.

The trial court relied on seven aggravating circumstances to conclude the high term was appropriate for the enhancement. Under current law, the court's reliance on at least five of those factors was improper.[8]  Under these circumstances, we conclude it is reasonably probable the court may have imposed a lesser sentence but for its failure to adhere to the explicit mandates of newly amended section 1170.1.

e.     *The Sentencing Error Was Not Harmless*

The parties discuss a variety of harmless error approaches taken by appellate courts in recent cases when trial courts impose upper term sentences based on aggravating circumstances not properly determined under amended sections 1170 and 1170.1, an issue currently pending before the California Supreme Court in *People v. Lynch*.  We need not weigh in on the split of authority, because, unlike this case, those cases involved the retroactive application of the new law.  (See *Lopez, supra,* 78 Cal.App.5th at p. 465; *Zabelle, supra*, 80 Cal.App.5th at p. 1109; *Dunn, supra,* 81 Cal.App.5th at p. 403; *Falcon, supra*, 92 Cal.App.5th at pp. 921, 950–951, review granted.)  The amendments to section 1170.1 were in effect for many months at the time of sentencing, and we must presume the trial court was aware of the change in the law.  Because the trial court is presumed to have known about the limits imposed on its sentencing discretion, application of the state law standard for harmless error under *Watson, supra,* 46 Cal.2d at p. 836 is

---

[8]     Based on the prohibition against dual or overlapping use, the court also improperly relied on the first two factors it cited. However, as stated above, appellant forfeited this argument by failing to raise it at sentencing.

straightforward.  (See, e.g., *Falcon*, at p. 950 [noting *Watson* harmless error test has been applied when a sentencing court considered improper sentencing factors under statutory scheme that had not changed in interim].)

"When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper." (*Price, supra,* 1 Cal.4th at p. 492.)  A reasonable probability of a more favorable result exists where the improper factor or factors was or were determinative for the sentencing court or where the reviewing court cannot make that determination.  (*Avalos, supra,* 37 Cal.3d at p. 233; see *People v. McDaniels* (2018) 22 Cal.App.5th 420, 426 ["When a trial court has abused its discretion in choosing among available sentencing options, such as by relying on an improper sentencing factor, a reviewing court must still affirm unless 'the error complained of has resulted in a miscarriage of justice.' [Citation.]  In these situations, the trial court has revealed which sentencing choice it prefers, and the reviewing court must decide whether there is a reasonable probability that the trial court's lawful exercise of discretion on remand will lead it to make a different choice."]; *In re F.M.* (2023) 14 Cal.5th 701, 715 [*Watson* standard has been applied to sentencing error in adult criminal cases where trial court is aware of its discretion at sentencing].)

Although the trial court cited the appropriate rules, its sentencing determination does not reflect that it fully appreciated the significance of the newly adopted presumptive middle term. After finding, without any analysis of the underlying facts, that it could rely on seven aggravating circumstances and then finding

34

no mitigating circumstances, the court imposed the upper sentence as to the enhancement at issue. The court's cursory recitation of aggravating factors failed to acknowledge that the discretionary limitation imposed by Senate Bill No. 567 "means any weighing of aggravating circumstances must occur under the weight of the new rule favoring the middle term as the maximum sentence." (*Falcon, supra,* 92 Cal.App.5th at p. 948, review granted.) As it appears the trial court was not fully cognizant of (or failed to apply) limitations on its sentencing discretion, resentencing is required. The record does not "clearly indicate[] the trial court would have imposed the same sentence" if it had known not only that most of the aggravating circumstances it relied on were improper but also that "the middle term was the presumptive maximum sentence." (*Id.* at pp. 926, 938; *People v. Lewis* (2022) 88 Cal.App.5th 1125, 1137–1138, review granted May 17, 2023, S279147; *Gutierrez, supra*, 58 Cal.4th at p. 1391.)

The Attorney General's analysis is too superficial. He considers only the existence of aggravating circumstances without evaluating their significance as justification for departing from the presumption favoring a middle term. The trial court expressed no opinion that appellant deserved the most severe punishment. Nor does the record provide an adequate basis for us to conclude the court would have concluded the aggravating circumstances justified an upper term had it included the weight of the presumptive middle term in its analysis.

Because not all aggravating factors survive the first step of the harmlessness analysis, the question is whether it is reasonably probable that the trial court would impose a shorter sentence had it relied only on permissibly proven factors. We can

35

only speculate as to how the court might have viewed the aggravating circumstances it relied on if it considered whether those circumstances justified imposition of the upper term bearing the presumptive middle term in mind. Critically, in addition to the impermissible factfinding, the record is devoid of indication that appellant was afforded the benefit of the newer middle-term presumption. As explained in *Falcon*, "[t]he statute's plain language creates an express presumption against the imposition of an upper term sentence, even when properly proven aggravating circumstances exist: a trial court must decide whether the existence of properly proven aggravating circumstances justify, not just the term selected, but upward departure from the presumptive rule itself. The presumption bears weight in this determination. As a result, the trial court no longer has full discretion to impose an upper term sentence without the weight of any presumption against it, as it did under the former version of the [determinate sentencing law]." (*Falcon, supra*, 92 Cal.App.5th at p. 921, review granted.)

"[T]o the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval, supra*, 41 Cal.4th at p. 840.) The aggravating factors on which the court relied here are of this nature, requiring "an imprecise quantitative or comparative evaluation of the facts." (*Ibid*.)

Some degree of speculation would necessarily be required for us to conclude the jury would have agreed with the trial court's evaluation, or that the court would have exercised its

recently limited sentencing discretion in the same way had it taken into account the statutory presumption in favor of the middle term.  On this record, we cannot conclude there is no reasonable probability that the trial court would have imposed a more lenient sentence had it been left with only the aggravating circumstances that we assume a jury would have found true beyond a reasonable doubt.  Appellant is entitled to a sentencing decision reached through the exercise of the court's informed discretion.  This requires a sentencing decision that affords weight to the middle-term presumption, and any upward departure must comport with the factfinding limitations applicable to the firearm enhancement under section 1170.1.  (See *Falcon, supra*, 92 Cal.App.5th at pp. 921, 925, review granted.)  On this record we conclude resentencing is in order.

3.      ***The Trial Court Erred in Doubling the Firearm Enhancements as to Counts 1 and 2.***

As to count 1, the trial court imposed the upper term sentence of 10 years for the firearm enhancement (§ 12022.5), doubled to 20 years (§ 1170.12).  On the concurrent count 2, the court imposed the low term of three years for the firearm enhancement (§ 12022.5), doubled to six years (§ 1170.12).  The parties agree, as do we, that the trial court erred in doubling the two firearm enhancements for counts 1 and 2.

Where, "as here, a defendant has one prior strike conviction that has been pleaded and either proved or admitted, the determinate term for the current felony offense is twice the term otherwise provided as punishment.  [Citations.]  However, enhancements are added after the determination of the base term and are not doubled.  [Citations.]"  (*People v. Sok* (2010) 181 Cal.App.4th 88, 93–94, fn. omitted; see also *People v. Hardy*

37

(1999) 73 Cal.App.4th 1429, 1433 ["In sentencing a defendant who has one prior strike, the court may not double any enhancements it imposes"].)

Because we are vacating appellant's sentence as to the firearm enhancement on count 1, and its mistaken doubling of the firearm enhancements as to both counts, appellant is entitled to a full resentencing. (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1096.) "[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.)

## DISPOSITION

Appellant's sentences as to the enhancements attached to counts one and two are vacated and this matter is remanded for full resentencing in accordance with sections 1170 and 1170.1, and subsequent correction of the abstract of judgment. The judgment is otherwise affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.                    WILEY, J.